# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAURICE STROMAN,** | : | CIVIL NO. 1:16-CV-2543 |
| **Plaintiff** | : | (Chief Judge Conner) |
| v. | : | |
| **JOHN WETZEL**, *et al.*, | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Maurice Stroman ("Stroman"), an inmate who, at all relevant times, was housed at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon"), commenced this action pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is proceeding *via* an amended complaint. (Doc. 37). The remaining defendants are Lieutenant Eberling and Correctional Officer Hemcher. (Id.)

Presently ripe for disposition is defendants' motion (Doc. 61) for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the court will grant defendants' motion and enter summary judgment in their favor.

## I. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond

the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## II. Allegations of the Amended Complaint

Stroman asserts that he is a known asthmatic and suffered asthma attacks after inhaling oleoresin capsicum ("OC") spray on two occasions. (Doc. 37 ¶¶ 9, 10, 21). On August 17, 2015, defendant Eberling allegedly authorized the unannounced use of OC spray on Stroman's housing block before the air handlers were secured. (Id. at ¶ 10). Stroman alleges that the OC spray traveled through the air ventilation system, into his cell, and caused him to suffer an asthma attack. (Id. at ¶¶ 10, 14). During this incident, Stroman used his inhaler, but continued to have trouble breathing. (Id. at ¶ 12). Defendant Hemcher allegedly approached Stroman's cell and inquired about his difficulty breathing. (Id.) Stroman informed defendant Hemcher that he suffers from asthma and was having difficulty breathing. (Id.) Stroman alleges that defendant Hemcher walked away from the cell and told other

2

inmates that Stroman was sitting on his bed and was alright. (Id. at ¶ 13). After defendant Hemcher left the area, Stroman continued to have difficulty breathing and eventually lost consciousness. (Id. at ¶ 14). Stroman asserts that correctional officers and defendant Eberling were present when he regained consciousness. (Id. at ¶ 15). Stroman alleges that he was handcuffed and shackled, and assessed by a nurse. (Id.) The nurse administered an Albuterol inhaler and placed Stroman on sick call for the following day. (Id.)

On August 18, 2015, a physician's assistant diagnosed Stroman with an upper respiratory infection and placed him on cough medicine. (Id. at ¶ 17). After his exposure to the OC spray on August 15, 2017, Stroman suffered from headaches, throat pain, and chest pain. (Id. at ¶¶ 18, 19).

On April 10, 2016, Stroman alleges that defendant Eberling again authorized the unannounced use of OC spray on his housing block before the air handlers were secured. (Id. at ¶ 21). The OC spray allegedly traveled through the air ventilation system, into Stroman's cell, and caused him to suffer an asthma attack. (Id.) A nurse subsequently treated Stroman with a respirator, but allegedly ignored Stroman's complaints related to his throat. (Id. at ¶¶ 22, 23).

On August 26, 2016, Stroman was transported to an outside hospital due to ongoing complications with his asthma, which he alleges began with his exposure to OC spray on August 17, 2015 and April 10, 2016. (Id. at ¶¶ 26, 29). Stroman was subsequently diagnosed with Hypertrophic Cardiomyopathy and continues to take medication for his asthma, heart condition, and high blood pressure. (Id.)

3

**III.     Statement of Material Facts[1]**

Stroman has had asthma since childhood.  (Doc. 62 ¶ 1; Doc. 63-1, Deposition of Maurice Stroman ("Stroman Dep."), 19:24-20:1).  Stroman has used albuterol sulfate to treat his asthma for more than twenty-one (21) years.  (Doc. 62 ¶ 2; Doc. 63-1, Stroman Dep. 20:24-21:3).  He also takes a steroid once per day.  (Doc. 62 ¶ 3; Doc. 63-1, Stroman Dep. 21:7-20).  During an asthma attack, Stroman experiences "sogginess" in his eyes, difficulty breathing, and dizziness.  (Doc. 62 ¶ 4; Doc. 63-1, Stroman Dep. 22:23-23:1).  When Stroman experiences the onset of his asthma symptoms, he uses his inhaler and breathing techniques, which help decrease his symptoms.  (Doc. 62 ¶ 5; Doc. 63-1, Stroman Dep. 23:2-16).  Stroman's asthma symptoms start with short breaths.  (Doc. 62 ¶ 6; Doc. 63-1, Stroman Dep. 17:17-20).  If he does not use his inhaler quickly, he may start to sweat and may pass out.  (Id.)

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial.  See id.  Unless otherwise noted, the factual background herein derives from defendants' Rule 56.1 statement of material facts.  (Doc. 62).  Stroman did not file a response to defendants' statement of material facts.  The court accordingly deems the facts set forth by defendants to be undisputed.  See LOCAL RULE OF COURT 56.1.  See also (Doc. 68 ¶ 3) (advising Stroman that failure to file a responsive statement of material facts would result in the facts set forth in defendants' statement of material facts being deemed admitted).

Since 2012, Stroman has had a Z code housing status, indicating that he must be single-celled. (Doc. 62 ¶ 7; Doc. 63-1, Stroman Dep. 25:22-26:2-6).

The first time Stroman passed out from asthma-related complications was on August 17, 2015. (Doc. 62 ¶ 8; Doc. 63-1, Stroman Dep. 17:21-22). On August 17, 2015, OC spray woke Stroman up and caused coughing, sweating, and dizziness. (Doc. 62 ¶ 9; Doc. 63-1, Stroman Dep. 19:8-12). Stroman believes his coughing was caused by the OC spray, a pepper spray. (Doc. 62 ¶ 10; Doc. 63-1, Stroman Dep. 29:4-14). Stroman was told by a fellow inmate that Lieutenant Eberling authorized the use of OC spray to be used on another inmate. (Doc. 62 ¶ 11; Doc. 63-1, Stroman Dep. 31:25-32:5).

During this incident, Stroman attempted to use his inhaler. (Doc. 62 ¶ 12; Doc. 63-1, Stroman Dep. 26:15-19). Stroman's cell neighbor called to him and he tried to answer but could not breathe. (Doc. 62 ¶ 13; Doc. 63-1, Stroman Dep. 26:23-27:2). Stroman was given his inhaler, which helped with his breathing. (Doc. 62 ¶ 14; Doc. 63-1, Stroman Dep. 28:11-13). Stroman pushed the button inside his cell for medical emergencies, which alerts staff in the bubble. (Doc. 62 ¶ 15; Doc. 63-1, Stroman Dep. 30:1-12). Stroman fell on his door. (Doc. 62 ¶ 16; Doc. 63-1, Stroman Dep. 31:9-16). His cell neighbor called for a guard, although he could not see into Stroman's cell. (Id.)

During this time, correctional officer Hemcher was doing rounds. (Doc. 62 ¶¶ 17, 20; Doc. 63-1, Stroman Dep. 33:14-34:19). He approached Stroman's cell and asked him "what's up[?]" (Doc. 63-1, Stroman Dep. 35:5-6). Stroman told Hemcher

he could not breathe and that he has asthma, although Hemcher may not have heard him. (Doc. 62 ¶ 18; Doc. 63-1, Stroman Dep. 34:16-19). When Hemcher was standing at Stroman's cell door, Stroman was dizzy, he could not breathe or move, and he was cold and coughing. (Doc. 62 ¶ 19; Doc. 63-1, Stroman Dep. 34:23-35:3). Stroman believes that Hemcher should have known that he has asthma because officers get a list from the medical department listing people who cannot be in contact or around OC spray, including asthmatics. (Doc. 62 ¶ 21; Doc. 63-1, Stroman Dep. 35:12-25). Stroman believes that if Hemcher was not aware of Stroman's asthma from this list, he should have been aware from the apparent stress Stroman was suffering. (Doc. 62 ¶ 22; Doc. 63-1, Stroman Dep. 36:3-8).

Stroman asked *via* his cell call button for air in the hallway but, according to an officer, Stroman was told that Lieutenant Eberling would not move him because they have to take precautions before moving level 5 inmates. (Doc. 62 ¶ 23; Doc. 63-1, Stroman Dep. 37:16-38:10). Stroman then pressed his cell call button for medical attention and was told that his request would be passed along. (Doc. 62 ¶ 24; Doc. 63-1, Stroman Dep. 38:11-12).

Unknown officers then entered Stroman's cell to handcuff him and turn him over. (Doc. 62 ¶ 25; Doc. 63-1, Stroman Dep. 28:4-7). Stroman tried to use his breathing techniques while he was handcuffed and shackled. (Doc. 62 ¶ 26; Doc. 63-1, Stroman Dep. 28:16-18). An unknown number of officers and one female medical individual entered Stroman's cell to tend to him. (Doc. 62 ¶ 27; Doc. 63-1, Stroman Dep. 36:12-25).

Stroman later learned that Lieutenant Eberling went to his cell on August 17, 2015 to ask him about his condition. (Doc. 62 ¶¶ 28, 29; Doc. 63-1, Stroman Dep. 57:20-25; 27:9-13). When Eberling approached Stroman's cell, he was practicing his breathing on his bed and trying to stay still. (Id.) Stroman tried to tell Eberling that he has asthma and could not breathe, but Eberling walked away. (Doc. 62 ¶ 30; Doc. 63-1, Stroman Dep. 27:15-17). Eberling later returned to check on Stroman. (Doc. 62 ¶ 31; Doc. 63-1, Stroman Dep. 27:17-20). At this time, Stroman was sitting on his bed and his dizziness was worsening. (Id.) Stroman noticed that his inhaler was on a shelf, and not in his hands. (Doc. 62 ¶ 32; Doc. 63-1, Stroman Dep. 27:21-23). Stroman was subsequently informed that he was unconscious for about an hour. (Doc. 62 ¶ 33; Doc. 63-1, Stroman Dep. 27:25-28:1).

On August 18, 2015, Stroman was again treated by the medical department. (Doc. 62 ¶ 34; Doc. 63-1, Stroman Dep. 41:16-17). Medical personnel informed Stroman that his throat was red and that he likely had a cold. (Doc. 62 ¶ 35; Doc. 63-1, Stroman Dep. 42:10-12). Stroman was given Excedrin for his headache, Benadryl for his throat, amoxicillin, and Alvesco. (Doc. 62 ¶ 36, 38; Doc. 63-1, Stroman Dep. 42:21-25; 43:10).

Stroman continued to submit several sick calls to be seen by the medical department due to throat and chest pain. (Doc. 62 ¶ 37; Doc. 63-1, Stroman Dep. 42:7-9).

On April 10, 2016, Stroman suffered another asthma attack. (Doc. 62 ¶ 39; Doc. 63-1, Stroman Dep. 47:20-24). Stroman believes his asthma symptoms on this

occasion were triggered by OC spray. (Doc. 62 ¶ 40; Doc. 63-1, Stroman Dep. 17:22-24). Stroman was coughing, wheezing, sweating, and spit up blood. (Doc. 62 ¶ 41; Doc. 63-1, Stroman Dep. 48:6-9). He was moved out of his cell immediately and given a respiratory treatment. (Doc. 62 ¶ 42; Doc. 63-1, Stroman Dep. 48:10-14). Lieutenant Eberling is the only person Stroman can recall being involved with the OC spray being released on April 10, 2016. (Doc. 62 ¶ 43; Doc. 63-1, Stroman Dep. 50:4-7).

During both of these incidents, the air system was on and was never turned off. (Doc. 62 ¶ 44; Doc. 63-1, Stroman Dep. 74:1-3).

Lieutenant Eberling was the restricted housing unit ("RHU") shift lieutenant on August 17, 2015 and April 10, 2016. (Doc. 62 ¶ 45; Doc. 63-1, Stroman Dep. 75:1-3).

## IV. Discussion

### A. Eighth Amendment Claim

Stroman argues that his exposure to secondhand OC spray constituted cruel and unusual punishment in violation of his Eighth Amendment rights. A prison official violates the Eighth Amendment when: (1) the prisoner suffers an objectively, sufficiently serious deprivation; and (2) the prison official acts with deliberate indifference to the prisoner's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Fortune v. Hamberger, 379 F. App'x 116, 122 (3d Cir. 2010) (stating, "an inmate [is required] to show that 'he is incarcerated under conditions posing a substantial risk of serious harm,' and that prison officials demonstrated a

8

'deliberate indifference' to his health or safety"). Under the first element, a "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Farmer, 511 U.S. at 834. To establish deliberate indifference under the second element, the prison official must: (1) know of and disregard an excessive risk to inmate health or safety; (2) be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists; and (3) draw the inference. Id. at 837.

Stroman testified that a fellow inmate informed him that defendant Eberling authorized the use of OC spray on another inmate on August 17, 2015. (Doc. 63-1, Stroman Dep. 31:25-32:5). Once Stroman began experiencing difficulty breathing, he pressed his cell call button and asked to be moved to get air. (Doc. 63-1, Stroman Dep. 37:16-38:10). However, he was told that defendant Eberling would not move him because prison officials must take precautions before moving level 5, high risk inmates. (Id.) Stroman pressed his cell call button again to ask for medical attention and was told that his request would be passed along. (Doc. 63-1, Stroman Dep. 38:11-12). Defendant Eberling then approached Stroman's cell to check on him. (Doc. 63-1, Stroman Dep. 27:9-13). Stroman was sitting on his bed, practicing his breathing, and trying to stay still. (Id.) Stroman tried to tell defendant Eberling that he has asthma and could not breathe. (Doc. 63-1, Stroman Dep. 27:15-17). Defendant Eberling subsequently returned to Stroman's cell to check on him. (Doc. 63-1, Stroman Dep. 27:17-19). At this time, his dizziness was getting worse. (Doc. 63-1, Stroman Dep. 27:19-20). Corrections staff were then summoned to Stroman's

9

to restrain him and a medical individual entered the cell to treat to him. (Doc. 63-1, Stroman, Dep. 37:15-25). Stroman acknowledges that staff came into his cell as soon as he was unresponsive. (Doc. 63-1, Stroman Dep. 37:19-21). The following day, August 18, 2015, Stroman was again treated by the medical department. (Doc. 63-1, Stroman Dep. 42:14-23).

With respect to defendant Hemcher, the record reflects that he was doing rounds on August 17, 2015, approached Stroman's cell, and asked "what's up[?]" (Doc. 63-1, Stroman Dep. 33:14-34:19). Stroman told him he could not breathe and that he has asthma. (Doc. 63-1, Stroman Dep. 34:16-19). Stroman admits that defendant Hemcher may not have heard him. (Id.) When defendant Hemcher was standing at his cell door, Stroman was dizzy, he could not breathe or move, he was cold, and was coughing. (Doc. 63-1, Stroman Dep. 34:23-35:3). Stroman believes that defendant Hemcher should have known that he is an asthmatic based on the list from the medical department listing people who cannot be in contact or around OC spray. (Doc. 63-1, Stroman Dep. 35:12-25). Stroman surmises that if defendant Hemcher was not aware of his asthma from this list, he should have been aware from the apparent stress he was suffering. (Doc. 63-1, Stroman Dep. 36:3-8). Stroman concedes that he does not know if defendant Hemcher actually knew that he has asthma, but claims that "[i]t was apparent." (Doc. 63-1, Stroman Dep. 36:9-11).

The undisputed evidence demonstrates that defendants checked on Stroman and summoned medical staff to treat him. When defendants approached Stroman's

cell, the record reflects that Stroman was awake, sitting and/or standing, and practicing his breathing exercises. The evidence further reflects that, once Stroman's condition worsened, corrections staff entered Stroman's cell to restrain him and medical staff provided treatment. There is no inference that defendants denied Stroman medical assistance during the asthma attacks. Furthermore, Stroman has presented no evidence that defendants Hemcher and Eberling were actually aware that he is an asthmatic. Specifically, he has not presented any evidence that defendants Eberling or Hemcher ever reviewed the list of inmates with asthma, were aware that Stroman was on the block when the OC spray was released in response to another inmate's actions across the block, and actually knew that the OC spray could reach Stroman's cell and potentially cause harm.

In opposing a motion for summary judgment, Stroman cannot rely on his unsupported assertion that "[i]t was apparent" that he was an asthmatic, and that defendants should have known that he has asthma. (Doc. 63-1, Stroman Dep. 36:9-11). The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" and cannot survive Rule 56 scrutiny by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989); see also FED. R. CIV. P. 56(c), (e). "To overcome a motion for summary judgment, a plaintiff must come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 259 (3d Cir. 2010) cert.

denied, 562 U.S. 1272, 131 S.Ct. 1614, 179 L.Ed.2d 502 (2011) (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001)). Stroman has failed to meet his burden with respect to his deliberate indifference claim. Consequently, defendants are entitled to summary judgment in their favor on the Eighth Amendment claim.

### B. Qualified Immunity

Even if Stroman had stated a colorable claim relating to his exposure to secondhand OC spray, defendants are nevertheless entitled to qualified immunity from this claim for damages. In order to establish a civil rights claim, Stroman must show the deprivation of a right secured by the United States Constitution or the laws of the United States. However, government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. It "provides ample

protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first). As stated, the court finds that Stroman failed to establish the violation of a constitutional right. Defendants simply could not have recognized that their use of OC spray in response to another inmate's actions across the block would violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson, 526 U.S. at 609. Therefore, defendants are protected from liability by qualified immunity.

### C. Violation of Prison Policy

Stroman appears to assert liability based on defendant Eberling's violation of prison policies, procedures, and rules. However, a violation of an internal prison

13

policy does not automatically rise to the level of a constitutional violation. "[A] prison policy manual does not have the force of law and does not rise to the level of a constitutional violation." Atwell v. Lavan, 557 F.Supp.2d 532, 556, n. 24 (M.D. Pa. 2008) (citing Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 154 (3d Cir. 2004)). The Third Circuit has clearly stated that "agency interpretive guidelines 'do not rise to the level of a regulation and do not have the effect of law.'" Mercy Catholic Med. Ctr., 380 F.3d at 155 (citation omitted). Therefore, defendant Eberling cannot be liable simply for violating a prison policy and defendants' motion will be granted as to this claim. See Estrella v. Hogsten, 2007 WL 2065879 (M.D. Pa. July 16, 2007) (holding that mere failure of prison officials to follow their own regulations alone is not a constitutional violation).

## V. Conclusion

For the reasons set forth above, the court will grant defendants' motion (Doc. 61) and enter summary judgment in their favor. An appropriate order will issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     March 31, 2020